UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

**LUZ GONZALEZ-BERMUDEZ,**

    Plaintiff,

        v.                            CIV. NO. 14-1620(PG)

**ABBOTT LABORATORIES PR INC., ET. AL.,**

    Defendants.

### OPINION AND ORDER

    Plaintiff Luz Gonzalez-Bermudez (hereinafter "Plaintiff" or "Gonzalez") filed this action pursuant to the Age Discrimination in Employment Act ("ADEA" or "the Act"), 29 U.S.C. §§ 621-634, against her employer Abbott Laboratories PR Inc. ("Abbott" or "the Company") and her supervisor Kim Perez[1] (hereinafter "Perez"). Plaintiff alleges she has been the victim of discrimination on the basis of age and of retaliation for engaging in protected conduct. See Docket No. 1. Specifically, Gonzalez claims that she was demoted, bypassed for promotion and suffered other adverse employment actions because of her age and for complaining of age discrimination.[2] See id. The Plaintiff also pleads supplemental state law claims of age discrimination under Puerto Rico's anti-discrimination statute, Law No. 100 of June 30, 1959 ("Law No. 100"), P.R. LAWS ANN. tit. 29, § 146, *et seq.,* as well as claims of retaliation under Puerto Rico's anti-retaliation statute, Law No. 115 of December 20, 1991 ("Law No. 115"), P.R. LAWS ANN. tit. 29, § 194a.

---

[1]There being no individual liability under ADEA, the claims against Kim Perez are brought pursuant to local law. See Docket No. 55 at page 22 n. 28. Because the defendants did not argue for their dismissal, the claims against her remain intact.

[2]Although the plaintiff makes a passing reference in her Complaint to the terms "hostile work environment" and "hostile behavior," the court agrees with the defendants when they state in their motion that it is unclear whether she brings forth such a claim, and if she does, the record does not support the same. See Docket No. 42 at page 6 n. 2. The Plaintiff does not argue against it, and thus, the court deems it waived. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. … Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (citations and quotation marks omitted). To the extent no claims of hostile work environment were raised, the court will circumscribe its discussion to Plaintiff's allegations of discrimination and retaliation.

Before the court is the defendants' Motion for Summary Judgment (Docket No. 42), Plaintiff's Opposition[3] thereto (Docket No. 55) and defendants' reply (Docket No. 66). After a close examination of all the evidence on record and a careful review of the applicable statutory and case law, the court **DENIES** the defendants' motion for summary judgment for the reasons explained below.

### I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When the party who bears the burden of proof at trial is faced with a properly constituted summary judgment motion, defeating the motion depends on her ability to show that such a dispute exists." Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir.2014)(citing Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir.2010)).

If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). "Summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

At the summary judgment juncture, the court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir.2002). The court reviews the record "as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135

---

[3]The court notes that Plaintiff's response sometimes drips with sarcasm, and its tone occasionally borders on vitriolic. <u>See</u>, <u>e.g.</u>, Docket No. 55 at footnotes 28, 31. While we understand that a party's attorney is tasked with zealously defending his/her client's interests, the court reminds the appearing attorneys that "[c]ivility in litigation is a value that must be protected … . Members of the bar must treat each other, as well as parties and witnesses, in a civil, respectful, and courteous manner." <u>Delgado-Rodriguez v. BCBG Max Azria Grp.</u>, Inc., No. CIV. 12-1085 JAG, 2013 WL 1314773, at *2 (D.P.R. Mar. 27, 2013). Counsel are forewarned that they are expected to adhere to the applicable ethical standards in the way they comport themselves in all proceedings before the undersigned. Any deviation will result in sanctions.

(2000). This is so because credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

## II. FACTUAL FINDINGS

Before setting forth the facts found by this court found to be undisputed and relevant to the matter at hand, we must first address a compliance issue arising from both parties' statements of facts.[4]

The parties objected to each other's proposed statements of facts on the grounds that the documents submitted in support thereof were not properly authenticated by affidavit. After the 2010 amendments to the Federal Rules of Civil Procedure, Rule 56(c)(1) states that a party must support its assertions of fact or dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The objecting party must thus state the proper grounds for which the opposing party's evidence *cannot be presented in a form that would be admissible at trial*. A plain objection simply stating that the exhibit proffered has not been properly authenticated will not suffice. See Int'l Shipping Agency, Inc. v. Union de Trabajadores de Muelles Local 1740, No. CIV. 12-1996 SCC, 2015 WL 5022794, at *3 (D.P.R. Aug. 21, 2015) ("Because [plaintiff] makes no argument that the defendants' evidence could not be authenticated, its objection should be denied."). Seeing as both parties' objections were unsubstantiated, the same are denied and the statements were not considered unauthenticated if supported by potentially admissible evidence.

In accordance with the foregoing, the court found the following relevant facts were undisputed:

---

[4] The court notes that on several occasions the defendants inaccurately cited or improperly characterized the content of the supporting documents attached to their statement of facts. As a result, the court was forced to reconstruct the facts of this case considering the record and the document themselves, and not the defendants' mischaracterization of such. Deciphering statements of fact like these "wastes valuable chamber staff time … ." Mendez-Aponte v. Puerto Rico, 656 F. Supp. 2d 277, 291 (D.P.R. 2009), *aff'd sub nom.* Mendez-Aponte v. Bonilla, 645 F.3d 60 (1st Cir. 2011). Counsel for defendants shall refrain from any such misrepresentations during the forthcoming proceedings in the above-captioned case.

### *The Parties*

1.   Plaintiff Gonzalez is currently an employee of Abbott. She has been employed by Abbott uninterruptedly since 1984 when she began her career with the Company as a Pharmaceutical or Medical Representative.

2.   Plaintiff was born on June 6, 1960.

3.   Co-defendant Abbott is a for-profit corporation duly created under the Laws of and with its principal place of business in the Commonwealth of Puerto Rico. Abbott is at all times relevant herein an employer as defined by the statutes under which the Plaintiff seeks relief.

4.   Co-defendant Kim Perez was the Plaintiff's supervisor from January 10, 2011 until May 12, 2014. Prior to taking over the position of General Manager on May 12, 2014, co-defendant Perez worked as Abbott's Marketing Manager and Marketing Director since 2008.


### *Other Abbott Employees*

5.   Since January 2013, Luz Miriam Adames ("Adames") has held the position of Business Human Resources Director for Puerto Rico at Abbott. Adames has been conversant with Abbott's Human Resources policies since 1988.

6.   Matthew Harris ("Harris") started as Abbott's General Manager on October 2, 2011 until co-defendant Kim Perez assumed said position on May 12, 2014.

7.   Taisgali Mendez ("Mendez") is the Regional Senior Manager for Talent Acquisition in Abbott. Mendez is in charge of managing all of the recruiting efforts for Abbott.

8.   Yolanda Gonzalez Bonilla is an Employee Relations Manager at Abbott. In her role as Employee Relations Manager, she is in charge of, among other things, assisting employees, managers and members of Abbott's Human Resources Department in answering their personnel matters related questions and employee relations activities. Yolanda Gonzalez also evaluates personnel related actions related to performance and discipline, among others, to ensure compliance with Abbott's policies.


### *Relevant Employment Policies*

9.   Abbott has a Workplace Harassment Policy that proscribes any type of illegal discrimination and harassment in the workplace. The purpose of the Workplace Harassment Policy is to provide a professional work

environment free from discrimination, intimidation, harassment or insult, including that based on race, sex, religion, color, national origin, age, disability, veteran status, sexual orientation, marital status, ancestry or any other reason prohibited by law.

10. Abbott's Workplace Harassment Policy contains a complaint procedure. According to the same, individuals are encouraged to report all perceived incidents of discrimination, harassment or retaliation. Any reported allegation of harassment, discrimination or retaliation has to be investigated. If the investigation reveals that the Workplace Harassment Policy has been violated, the Company will take disciplinary action up to and including termination.

11. Abbott classifies positions by levels. Each position level has an assigned compensation scale and benefits package.

12. Abbott has in place a program known as "TMR" or "Talent Management Review," which identifies potential candidates for promotion to certain positions. An employee selection for the TMR depends on criteria such as the potential candidate's performance, interpersonal relations and experience, among others. It is the process of identifying and developing individuals with the potential to compete for a leadership role.

13. According to Adames, when Abbott has identified a person who is a potential successor for a position, and a position becomes available, preference is given to an internal candidate over external candidates. If an internal Abbott employee who is already prepared to occupy a position and meets its requirements and does not need any training to occupy it, preference may also be given to such an individual (as an internal candidate) over external candidates.

14. Abbott provides its employees with yearly written work performance evaluations.

15. As part of the process of evaluating its employees, Abbott uses a rating system with the following categories: Exceeds Expectations ("EE"); Achieved Expectations ("AE"), Partially Achieved Expectations ("PA") and Not Achieved Expectations ("NA").

16. Abbott's definition of a rating of Exceeds Expectations ("EE") is the following: "Exceeded expected competency behaviors. Met or exceeded goals and/or took on significant additional goals or projects and delivered on those. Consistently provided new insights for

creative/innovative approaches to work. Performance was among the highest of those in similar positions."

17. Abbott's definition of a rating of Achieved Expectations ("AE") is the following: "Achieved expected competency behaviors. Goals were met or were offset by successful performance in other areas. Often initiated ideas or suggestions for improvement without being asked. Contributed much to the success of the organization/unit."

18. Abbott's definition of a rating of Partially Achieved Expectations ("PA") is the following: "Achieved behaviors in SOME competencies. Met SOME expectations but improvement is required before performance can be considered to have achieved expectations."

19. Abbott's definition of a rating of Not Achieved Expectations ("NA") is the following: "Demonstrated competency behaviors below those required to be effective in the position. Missed a significant number of goals, expected results or commitments, or met goals in a way that compromised other responsibilities and/or created serious relationship issues."

20. At Abbott, during the process of preparing and discussing an employee's work performance evaluation, employees can submit evidence to their supervisor in order to have their evaluation reviewed and/or reconsidered.

21. When an Abbott employee receives a Partially Achieves ("PA") rating in an evaluation, one of the available mechanisms within Abbott is to place the employee on a Performance Improvement Plan ("PIP") for a period of ninety (90) days during which the supervisor works hand-in-hand with the employee in order to improve the employee's performance.

22. A PIP is one of the mechanisms that Abbott uses with employees who are not performing their job well. The PIP is one of the tools used at Abbott when an employee is not performing up to par, so that the employee can correct that behavior and achieve Abbott's expectations.

23. Pursuant to Abbott's Corrective Action Policy and the Corrective Counseling Process set forth in the same, when an employee is not performing according to Abbott's expectations, the manager should initiate a verbal conversation with the employee. A PIP is one of the tools contained in the Corrective Action Policy. The Corrective Counseling Process is a progressive discipline policy.

24. The Corrective Action Policy was in full effect at Abbott during the period of time pertinent to this case, to wit, from 2010 until the present.

25. According to Adames, Abbott's Human Resources Department usually recommends that an employee be placed on a PIP when the employee has two consecutive years of receiving a rating of "Partially Achieves" ("PA") expectations and after having carried out a Corrective Counseling Process which has not produced any changes in the person's behavior.

26. According to Adames, an Abbott employee who is on a PIP cannot compete for any level position at Abbott.

27. As part of the process of evaluating the work performances of employees, in addition to giving employees their yearly work performance evaluations, Abbott also provides its employees with Midterm Evaluations. Supervisors prepare the Midterm Evaluations of the employees whom they supervise on or around the mid-point of the year. The purpose of Midterm Evaluations is to evaluate the employee's progress so far with respect to the yearly goals.

### *Employment History, Work Performance and Workplace Events*

28. On or around May of 2009, Gonzalez applied and was selected for promotion to the HCP National Sales Manager position at Abbott Nutrition. She was approximately 49 years old when she was selected for the promotion.

29. The HCP National Sales Manager position was classified under Abbott's compensation system as a Level 18 position. At this level, Gonzalez earned a salary of $113,984.00, an annual incentive of $28,301.00, was eligible to receive stock options and was provided a Company Car, Level 4.

30. Approximately eighteen (18) months after Gonzalez was promoted, Abbott reorganized its Nutrition Division's structure. As the result of this, her position was eliminated.

31. Other positions throughout the Company were also eliminated as part of the reorganization.

32. All the employees affected by the reorganization, including Gonzalez, were notified by letter on November 24, 2010 that the changes would become effective on January 10, 2011. On said date, Gonzalez signed a letter acknowledging the terms and conditions of her new position.

33.  Instead of terminating Plaintiff, Abbott informed her that she would be transferred to a lower level position effective January 2011. On December 22, 2010, Abbott informed her that as of January 10, 2011, she would be transferred to the Marketing Department as HCP Institutional Marketing Manager position, a Level 17 position. This was the first time in Gonzalez's career in Abbott that she would report to co-defendant Perez.

34.  Together with the elimination of Gonzalez's position, Abbott also eliminated a District Manager position (which was a Level 15 position) and a Senior District Manager position (which was a Level 16 position). The District Manager position that was eliminated was held by Rocio Oliver and the Senior District Manager position that was eliminated was held by Dennis Torres.

35.  At the time of the reorganization, Gonzalez supervised Rocio Oliver and Dennis Torres.

36.  On December 22, 2010, Abbott informed Gonzalez that she was going to be able to temporarily keep her current "Level" compensation and benefits for a maximum of two (2) years. This is known at Abbott as being assigned an "I" level. Accordingly, she was told that if during that period of time she did not apply for and obtained an alternate position, at the end of the two (2) years the "I" Grade would be eliminated and her salary and benefits would be adjusted to the compensation and benefits applicable to the position she was occupying when the period expired.

37.  During the two (2) year period, Gonzalez would occupy the HCP Institutional Marketing Manager position at a Level 18 "I." At this level, and during the two (2) years Gonzalez occupied this position, the highest salary earned was $116,834.00, an annual incentive of $29,000.00, she was eligible to receive stock options and was provided a Company Car, Level 4.

38.  Gonzalez was informed that during this two (2) year period she could apply to other vacant positions within Abbott. This matter was discussed with her on December 22, 2010. On that same date, Gonzalez accepted the transfer.

39.  On October 5, 2011, Perez sent Harris, the Division's General Manager at the time, an e-mail to which she attached Gonzalez's proposed evaluation for 2011. Perez evaluated various of Gonzalez's Core Job

Responsibilities and Competencies as "Partially Achieves" or "PA." She sent a follow-up e-mail to Harris on the topic on November 12, 2011.

40. On November 28, 2011, Gonzalez presented an internal complaint against her direct supervisor, Perez, then Director of Marketing, related to the way Perez was allegedly treating her. Plaintiff complained of a hostile work environment, including: (a) that her supervisor asks her about what is pending to be completed and not what she has done; (b) her workload; (c) she receives a lot of e-mails from her supervisor following up on pending matters; (d) she felt her supervisor was not telling her things directly (lack of communication).

41. On December 8, 2011, Plaintiff went on medical leave with the State Insurance Fund Corporation ("SIFC"). Gonzalez returned to work on June 8, 2012. Gonzalez was reinstated in her position and her compensation and benefits remained the same upon reinstatement.

42. On July 23, 2012, Perez discussed with Gonzalez the evaluation for the period beginning on January 2011 and ending on December 2011. Her performance was rated as "Partially Achieves." This is the second to last rating available in Abbott's performance appraisal system.

43. Pursuant to Abbott's performance appraisal procedures, the evaluation was prepared by Perez and reviewed by Harris, Human Resources Director Adames, and Human Resources Senior ER Specialist Ms. Suzanne Laforet ("Laforet").

44. The evaluation was discussed with her in three (3) separate meetings held on July 23, 2012, August 28, 2012 and September 17, 2012.

45. Upon receiving a "PA" rating in her work performance evaluation corresponding to the year 2011, Gonzalez made a request for reconsideration of her evaluation, based on evidence which she submitted. As a result of Gonzalez's reconsideration request, she received additional points in her evaluation.

46. On July 23, 2012, Gonzalez was also notified of the result of the investigation regarding her internal complaint about Perez. Plaintiff was informed that Abbott was not able to conclude that the conduct Gonzalez complained about constituted inappropriate conduct on the part of Perez.

47. On March 7, 2013, Gonzalez's performance evaluation for 2012 prepared by Kim Perez was discussed with Plaintiff. The same covered her performance from June 8, 2012, when González returned from her leave

with the SIFC until the end of the year. In her second evaluation, Gonzalez's performance was rated as "Achieves Expectations" or "AE."

48. During the two (2) year period after Plaintiff was transferred to the Marketing Department and she remained "I" Graded at Level 18, she did not apply to other positions within Abbott.

49. The reason why Gonzalez did not apply to any positions during the two-year period during which she held the HCP Institutional Marketing Manager Position is that, during that period of time, the positions that were announced and/or published at Abbott were neither Level 18 or 17 or 16, nor were they within the areas in which Gonzalez had experience.

50. On March 19, 2013, Perez and Adames communicated to Gonzalez that her "I" grade assignment had ended and that she had been assigned a Product Manager position, Level 15, effective March 18, 2013. Also, copy of the offer letter and conclusion of "I" grade was given to Gonzalez.

51. Since March 18, 2013, Gonzalez has occupied a Product Manager position. This position is classified as Level 15. At this level, Plaintiff's salary was $111,977.00, an annual incentive of $12,583.00 and was provided a Company Car, Level 3.

52. During the meeting of March 19, 2013, Gonzalez asked co-defendant Perez why she had not been assigned a Senior Product Manager position. Co-defendant Perez represented to Gonzalez that there were no Senior positions available at the time.

53. On March 20, 2013, Gonzalez reported for medical treatment with the SIFC. She returned to work on April 8, 2013. Gonzalez was reinstated in her Product Manager position and her compensation or other benefits remained the same upon reinstatement.

54. On April 1, 2013, Abbott sent Gonzalez a letter notifying her that if she did not return to work by April 8, 2013, they would proceed to terminate her employment. This letter stated that Abbott personnel had not been able to contact Gonzalez to know whether she was going to return to work. The reason provided for reporting for treatment was a relapse ("recidiva") of a prior injury or condition, and Gonzalez had already exhausted her SIFC employment reserve period.

55. Pursuant to Abbott's policy, in early September 2013, co-defendant Perez prepared Gonzalez's Midterm Evaluation. ME 2013 contains the goals that Gonzalez had to meet and, among other things, co-defendant Perez's

mid-year assessment (as of September 3, 2013) of Gonzalez's performance at that point of the year with respect to each goal.

56.   On October 15, 2013, Gonzalez's attorneys sent a letter on her behalf to Harris and co-defendant Perez in which they notified them that they had been retained by Gonzalez to represent her in any claims of age discrimination that she may have against Abbott, co-defendant Perez and any other natural or juridical person. In this letter, Gonzalez's attorneys requested that Abbott "refrain from any further discriminatory conduct against [Gonzalez] and that no retaliatory measures are taken against her."

57.   After receiving the letter of October 15, 2013 sent to Abbott by Gonzalez's attorneys, Adames did not conduct an investigation of Gonzalez's claims of discrimination.

58.   On October 22, 2013, Adames sent an e-mail to Mendez in which she requested information from Mendez regarding whether or not Plaintiff had applied to positions during the last two years. Adames told Mendez that they had a complaint and that Abbott's attorneys were requesting this information.

59.   On October 29, 2013, Gonzalez filed an administrative charge alleging age discrimination and retaliation with the Antidiscrimination Unit of the Puerto Rico Department of Labor and Human Resources ("ADU"). This charge was notified to Abbott on October 31, 2013.

60.   On October 31, 2013, Gonzalez sent an e-mail to co-defendant Perez. In this e-mail, Gonzalez complained about the fact that Marisabel Aponte and Glamary Perez - other employees supervised by Perez - had received or had access to presentations or information that Perez had not shared with Plaintiff. Gonzalez also stated that this was not the first time that this had happened and that for the good of the business and to ensure that everyone was aligned to U.S. strategies, she was asking co-defendant Perez to include her in any e-mails through which co-defendant Perez sent any presentations. Gonzalez also stated that she had had to request the presentation from Glamary Perez so that Gonzalez could review it and use it as part of her strategies, as Marisabel Aponte had been able to do. To this, Gonzalez added "that way, we all have the same opportunities and sources of assistance." Gonzalez complained that the same thing also happened with a Malnutrition Presentation for U.S., which Gonzalez had to request from Marisabel

Aponte because Plaintiff did not have access to the same. Gonzalez added that she had found out about this through comments that were being made regarding important points as to the presentation. However, Gonzalez was out of the loop with respect to the strategy topics being discussed because co-defendant Perez had not shared them with her.

61.  On November 18, 2013, Gonzalez sent Harris an e-mail (copying Perez) regarding her claim before the Puerto Rico Department of Labor alleging that Perez and Abbott were discriminating against her because of her age. She then stated that she was interested in a Level 16 <u>Senior Product Manager</u> position and complained that she had found out that Abbott and Perez were seeking to fill. She further complained that Abbott's Talent Acquisition Manager was seeking candidates outside of Abbott. Gonzalez added that it also constituted a departure by Abbott of its policy of considering its own employees, prior to considering outsiders, to fill its positions. Generally, she alleged that she felt discriminated against because of her 2013 demotion and because Perez had sidelined her from information and presentations. She alleges that Perez's failure to notify her about the vacant Senior Product Manager position constitutes illegal retaliation. She then forewarned that she will be amending her claim to include a retaliation allegation.

62.  Gonzalez met the minimum requirements for the Senior Product Manager position.

63.  According to Mendez and co-defendant Perez, *on August 28, 2013*, the Senior Product Manager position was posted on LinkedIn and the position was also posted internally within Abbott. Neither Mendez or co-defendant Perez specified the date in which the Senior Product Manager position was posted internally.

64.  Co-defendant Perez was the Hiring Manager for the Senior Product Manager position.

65.  On November 20, 2013, Harris responded via letter to Gonzalez's e-mail of November 18, 2013. Harris admitted that, as of the date of his letter, Abbott was already working with the Talent Acquisition Manager on a search for a Senior Product Manager. Harris stated that Abbott would "*soon be posting*" the Senior Product Manager position.

66.  On November 22, 2013, Harris sent an e-mail to Mendez, with copy to Adames and to co-defendant Perez, in which Harris asked Mendez when the

Senior Product Manager position would be posted. Harris added that it seemed like Abbott had a good *external* candidate slate.

67. Mendez declared that the Senior Product Manager position was posted *internally* at Abbott on *November 22, 2013*.

68. On November 27, 2013, Gonzalez sent Harris an e-mail requesting to be considered for the open Senior Product Manager position. In her email, she also requested a meeting to explain why she was being sidelined by Perez and stating that she did not agree with Harris' interpretation that Perez's conduct was not discriminatory or retaliation.

69. On December 1, 2013, Harris responded to Gonzalez's email telling her to submit her information to Human Resources for the Senior Product Manager position. With regard to Gonzalez's concerns about Perez, he told her that a meeting would be set up to discuss the matter.

70. On December 4, 2013, Elizabeth Rios ("Rios"), a Talent Associate who works for Mendez, sent an e-mail to Mendez including a list containing the names of the two Abbott employees who had applied for the Senior Product Manager position and information regarding both candidates, namely, Gonzalez and Edna de la Torre. As part of the information included in this e-mail with respect to Gonzalez, Rios stated that Plaintiff was ***demoted*** on March 18, 2013. With respect to Gonzalez's work performance evaluation ratings, Rios stated that Plaintiff had a rating of "Achieves Expectations" for the year 2013. (Emphasis ours.)

71. After applying for the Senior Product Manager position within Abbott's Commercial division, Gonzalez was able to pass the first stage of the application process and was selected for the last phase of the selection process along with two (2) other finalists.

72. Of the three (3), Gonzalez was the only internal candidate. The other two candidates, Glorimar Molina and Sandra Figueroa, were external.

73. The last stage involved preparing a product presentation from a business case provided and to be evaluated by a panel of judges. The panel of judges consisted of co-defendant Perez, Harris and Mendez.

74. Mendez admitted that, as part of the process of filling the position of Senior Product Manager, she was notified that Gonzalez had the intention to sue Abbott.

75. On December 19, 2013, after participating in a meeting with the other finalists to receive instructions for the presentation, Gonzalez did not make the presentation.

76. On December 19, 2013, Mendez sent Gonzalez an e-mail confirming Gonzalez's decision to withdraw from the selection process for the Senior Product Manager position. On December 20, 2013, Gonzalez answered Mendez's e-mail stating that she continued to be interested in the position, stating that she withdrew from the procedures because she did not feel comfortable and stating that during the last three (3) years, Harris and Perez had participated in her marketing presentations and performing the tasks described in the Senior Product Manager position. Mendez answered Gonzalez's e-mail thanking her for her e-mail and notifying her that another candidate was selected.

77. Glorimar Molina was 31 years old in November 2013. She was the person hired for the Senior Product Manager position. She had never worked for Abbott before.

78. On January 20, 2014, Gonzalez applied for a <u>Regional Sales Manager</u> position.

79. The Regional Sales Manager position was a Level 18 position.

80. On February 27, 2014, Perez and Yolanda Gonzalez, Employee Relations Manager, discussed with Plaintiff her performance appraisal review for 2013. Plaintiff received a "Partially Achieves" or "PA" rating in her 2013 evaluation.

81. Gonzalez was not the only employee within the Nutrition division that obtained a "Partially Achieves" or "PA" rating in her 2013 evaluation. Francisco Vargas and Dennis Torres also received the "Partially Achieves" rating.

82. On March 3, 2014, Mendez sent an e-mail copying Harris about Dennis Torres' *promotion* from level 14 to 16 and stating that Harris supported the compensation incentives.

83. Dennis Torres was 41 years of age on November 10, 2013.

CIV. NO. 14-1620(PG)                                                    Page 15

84.  The following table contains true and accurate information (provided by
     Abbott in its Amended Answers to Interrogatories) pertaining to
     Gonzalez, Rocio Oliver and Dennis Torres:

| Employee | Age on 11/10/13 | Position at Abbott & Level | Begin Date | Total Salary + Incentive | % Change |
|---|---|---|---|---|---|
| Luz Gonzalez | 53 | HCP National Sales Manager(18) | 4/20/09 | $142,285 | |
| | | HCP Institutional Marketing(18I) | 1/10/11 | $145,834 | 2.5% |
| | | Production Manager(15) | 3/18/13 | $124,560 | -14.6% |
| Rocio Oliver | 44 | District Manager(15) | 3/26/07 | $72,410 | |
| | | Hospital Clinic Specialist(15I) | 1/10/11 | $91,159 | 25.9% |
| | | Hospital Clinical Specialist(14) | 1/14/13 | $96,407 | 5.8% |
| | | Senior District Manager(16) | 3/31/14 | $109,151 | 13.2% |
| Dennis Torres | 41 | Senior District Manager(16) | 11/30/09 | $96,910 | |
| | | Senior Trade Sales Manager(14) | 3/18/13 | $81,614 | -15.8% |
| | | Distribution Manager(16) | 3/17/14 | $99,227 | 21.6% |

85.  Francisco Vargas, who on November of 2013 held the position of Category
     Manager (Level 15 position) and was forty-one (41) years old, was
     considered for the position of Regional Sales Manager (Level 18).

86.  On March 4, 2014, Harris sent an e-mail to Mendez and Adames in which,
     among other things, he stated that Abbott had already decided to promote
     Glamary Perez, but that said decision had not yet been announced
     publicly. Harris also stated therein that the backfill succession caused
     by Glamary Perez's promotion needed to be addressed. Harris stated that
     he wanted to get aligned on said matter, in particular, the movement of
     Abbott employees *Vickybel Rosario and Rocio Oliver* to other positions.

Harris added that he wanted to get aligned on that matter before publicly announcing Glamary Perez's promotion.

87. Vickybel Rosario was 41 years of age on November 10, 2013.

88. Rocio Oliver was 44 years of age on November 10, 2013.

89. As of March 10, 2014, Glamary Perez and Dennis Torres had both already accepted the positions that Abbott had offered to them.

90. On March 11, 2014, Gonzalez sent an e-mail to Harris, with the subject line "Senior District Manager Position," stating that she had become aware that Glamary Perez would occupy the Regional Sales Manager (Level 18) position for which Gonzalez had applied and was not even interviewed. Gonzalez stated that this was further evidence of age discrimination and retaliation for having filed a charge of discrimination. Gonzalez requested that, in view of the fact that Glamary Perez's former Senior District Manager position would now be vacant, she be appointed to occupy said position upon Glamary Perez's departure. Gonzalez stated that this was a Level 16 position for which she was fully qualified, that she had already performed the duties of this position in the past, and that there was no reason why Gonzalez could not perform them again. Gonzalez also told Harris that he was aware that she had opened a ticket at the Human Resources Department and that she intended to fully challenge her rating of Partially Achieves ("PA") corresponding to her 2013 evaluation, as unjustified, discriminatory and retaliatory.

91. Plaintiff had held the position of District Manager in the past and achieved the expectations of that position.

92. On March 17, 2014, Gonzalez presented an administrative charge before the Equal Employment Opportunity Commission ("EEOC") alleging that she had been retaliated against. This administrative charge was notified to Abbott on April 11, 2014.

93. In an e-mail dated March 19, 2014, Harris explained to Plaintiff that she had key job competency issues that had been discussed with her during the previous three (3) years and that required significant improvement. He listed among them: (a) inability to finish work by the expected time which steadily delayed the ability of her team to complete tasks thus negatively impacting the overall results of her team; (b) poor communication with her team and team leaders, including failing to provide project updates in meetings which in turn constantly caused

delays and problems within her team; (c) consistent inappropriate emotional responses to her supervisors and team leaders when they tried to address matters related to her poor performance and its effect on the team; and (d) failure to keep stronger relationships and communications with Brand Managers. Harris denied that Abbott had engaged in any discriminatory or retaliatory activity against her. He reiterated that the positions she had been applying for required excellent communication, relationships and leadership, as well as the ability to meet deadlines, issues she needs to address immediately.

94. Harris did not respond to Gonzalez's e-mail request to be appointed to the Senior District Manager position.

95. The Regional Sales Manager position was filled on March 17, 2014. Glamary Perez was selected. She was 39 years of age on November 10, 2013. The TMR program was used for the recruitment.

96. Vickybel Rosario was transferred to the position of Senior District Manager which had been left vacant by Glamary Perez. The transfer signified an increase in salary for Vickybel Rosario from $80,546.00 to $93,089.00.

97. On May 12, 2014, Perez was appointed General Manager for Abbott in Puerto Rico and Harris was named Division Vice President and General Manager responsible for Adult and Medical Nutrition in China. Since then, Perez has not supervised Gonzalez.

98. At the present, Gonzalez continues to work at Abbott under the direct supervision of Marisabel Aponte and she has not applied for any positions within the Company.

99. Marisabel Aponte was 33 years of age in November of 2013.

100. During her entire time as an Abbott employee, Gonzalez has never been placed on a PIP.

***Evidence Spoliation Issue***

101. Pursuant to Abbott's Electronic Messages Policy, the general rule is that e-mails contained in the "Inbox" and "Sent Items" folders are automatically deleted after thirty (30) days. However, pursuant to the policy, if a legal hold order is in effect, the e-mails contained in the "Inbox" and "Sent Items" folders cannot be deleted.

102. As previously stated, on October 15, 2013, Gonzalez's attorneys sent a letter on her behalf to Harris and co-defendant Perez in which they

notified them that they had been retained by Gonzalez to represent her in any claims of age discrimination.

103. On December 2, 2013, Gonzalez's attorneys sent a letter on Gonzalez's behalf to counsel for Abbott. In that letter, Plaintiff's attorneys requested that Abbott's legal representation issue a written notification instructing Abbott and all individuals who had custody over electronic data at Abbott to preserve any and all electronic data and other documentation pertaining to Gonzalez's claim. Plaintiff's attorneys further requested that counsel for Abbott reissue the litigation hold instructions periodically.

104. As part of the instant litigation, Abbott's legal representation instructed Abbott that a litigation hold should be put in place while Gonzalez's claims were being litigated.

105. Prior to receiving the instruction from its attorney to put in place a litigation hold, Abbott had already instituted the litigation hold pursuant to its Corporate Guideline. Pursuant to its Corporate Guideline, Abbott institutes the legal hold "when [they] receive the complaint." According to Adames, pursuant to the litigation hold, Abbott immediately preserved any documents it had in its Human Resources Offices regarding Gonzalez.

106. On March 11, 2014, Plaintiff sent an e-mail to Yolanda Gonzalez asking for access to her 2013 e-mails for the purpose of refuting the "PA" rating she received in her most recent performance evaluation for 2013. Gonzalez stated that she needed access to her e-mails covering the period of time between January 2013 until December 2013. Gonzalez told Yolanda Gonzalez that those e-mails contained the evidence which refuted the "Partially Achieves" rating that she had received in her last evaluation.

107. Regarding Gonzalez's request, on March 20, 2014, Adames sent an e-mail to Dana Deane, Division Counsel for Abbott since 1995 up to the present, copying Yolanda Gonzalez. In this e-mail, Adames stated: "Dana, we will appreciate very much if you can provide feedback to us in our response to [Plaintiff]. Also, to confirm if her e-mail is **under the legal hold process**." (Emphasis ours.)

108. After several e-mail exchanges, on March 21, 2014, Yolanda Gonzalez responded to Plaintiff's request for her 2013 e-mails that Abbott would not be providing her with access to said e-mails, that as per Abbott's

e-mail policies, if she had not saved her 2013 e-mails, her e-mails had been automatically deleted.

### III. DISCUSSION

## A. Age Discrimination in Employment Act

### 1. Discrimination

The ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 446 (1st Cir. 2009) (quoting 29 U.S.C. § 623(a)(1)). The Supreme Court has clarified that, regardless of whether direct or circumstantial evidence is used to support an ADEA claim, and of whether a burden-shifting analysis is employed by the court, plaintiffs must "establish that age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Fin. Servs., Inc., 129 S.Ct. 2343, 2351 (2009). The Supreme Court declared in Gross that this "but-for" standard is a much higher standard than that which has been applied in Title VII cases. Id. Notwithstanding, there is no "heightened evidentiary requirement" for plaintiffs to satisfy their burden of persuasion through "direct evidence" as opposed to "circumstantial evidence." Id. at 2351 n. 4. The rule is simply that "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Id. (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141-143, 147 (2000)).

### a. Prima Facie Case

In the absence of direct or "smoking gun" evidence, ADEA plaintiffs may nonetheless prove their cases by using the three-stage burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Melendez v. Autogermana, Inc., 622 F.3d 46, 50 (1st Cir. 2010). The now-familiar McDonnell Douglas burden-shifting scheme, which has been adapted for ADEA cases, requires that the plaintiff first make out a prima facie case for age discrimination by showing that:

> (i) she was at least 40; (ii) her work was sufficient to meet the employer's legitimate expectations; (iii) her employer took adverse action against her; and (iv) either younger persons were retained in the same position upon her termination or the employer did not treat age neutrally in taking the adverse action.

Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc., 804 F.3d 127, 129-30 (1st Cir. 2015), *cert. denied*, 136 S. Ct. 2518 (2016) (citing Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 26 (1st Cir.1998)).

In the context of a failure to promote claim, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was not hired despite her qualifications; and (4) the job was given to someone outside the protected class. See Flood v. Bank of Am. Corp., 780 F.3d 1, 13 n. 9 (1st Cir. 2015) (citing Lakshman v. Univ. of Me. Sys., 328 F.Supp.2d 92, 117 (D.Me.2004)). Nevertheless, the Supreme Court has held that "[b]ecause the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is *substantially younger* than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996) (emphasis ours). The First Circuit has agreed and adopted other circuit courts' interpretation of O'Connor "that an age difference of less than five years is insufficient to support a prima facie case of age discrimination." Williams v. Raytheon Co., 220 F.3d 16, 20 (1st Cir. 2000).

"This prima facie showing is not especially burdensome, and once established, gives rise to a rebuttable presumption that the employer engaged in intentional age-based discrimination." Autogermana, 622 F.3d at 50 (citing Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir.1995)).

In its motion for summary judgment, the defendants concede that the Plaintiff meets the first prong of the test. Then they simply state, without more, that plaintiff cannot establish the remaining elements of a prima facie case of age discrimination for demoting her and not promoting her to Senior Product Manager or Regional Sales Manager. See Docket No. 42 at page 12. Subsequently, defendants move on to explain the allegedly "valid, nondiscriminatory reasons for not selecting her for those positions." Id. In response, the Plaintiff argues that the court should deem waived any attack on her ability to establish a prima facie case in light of defendants' failure to develop an argument with respect to the same. In a footnote in their reply, the defendants respond that they "reiterate all the arguments contained in the motion for summary judgment thoroughly addressing plaintiff's failure to establish a [sic] ADEA prima facie case." Docket No. 66 at page 3 n. 2. The court agrees with Plaintiff that the defendants failed to argue that she is unable to establish the elements of the threshold stage.

     At any rate, it is out of the question that Gonzalez's demotion to a Level 15 position in 2013 and Abbott's failure to promote her (or even consider her)[5] to any of those two posts are adverse employment actions. <u>See Colon-Fontanez v. Municipality of San Juan</u>, 660 F.3d 17, 37 (1st Cir. 2011) ("[D]emotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees' may constitute adverse employment action, subject to the facts of a particular case."). In addition, Plaintiff has shown that she met the minimum requirements for the job. She had received a rating of "Achieves Expectations" on 2012; purports to have met the goals of her 2013 Midterm Evaluation, <u>see</u> Plaintiff's Statement of Uncontested Facts, Docket No. 53 at ¶¶ 138-158; and has never been placed on a Performance Improvement Plan or subjected to any progressive discipline. In addition, prior to the relevant reorganization in 2010, she had been promoted to a Level 18 managerial position at Abbott in 2009. It is also an uncontested fact that Gonzalez met the minimum requirements for the Senior Product Manager position. Finally, she has set forth sufficient evidence to support that similarly-situated younger counterparts were treated more favorably by means of raises and/or promotions. For example, Rocio Oliver and Dennis Torres, both formerly supervised by Plaintiff and significantly younger, were offered promotions and eventually held higher level positions than the one she now occupies. In addition, Plaintiff sets forth evidence of complaints to her supervisor and co-defendant Kim Perez that the latter granted Glamary Perez and Marisabel Aponte access to important information that was relevant to the performance of Plaintiff's functions. These two female employees were less than forty (40) years old at all relevant times herein.

     "Because only a minimal evidentiary showing is necessary to satisfy an employee's burden of production at this stage, it cannot be said that [plaintiff] did not set forth at least minimally sufficient evidence to overcome summary judgment on this prong of the test." <u>Torrech-Hernandez v. General Elec. Co.</u>, 519 F.3d 41, 49 (1st Cir.2008). Upon review of the record,

---

[5]Whether Abbott considered the Plaintiff for the Regional Sales Manager is in controversy. In their Statement of Uncontested Facts, the defendants state that Gonzalez was not considered for the position. <u>See</u> Docket No. 43 at ¶ 37. However, in their Amended Answers to Interrogatories, the defendants listed Gonzalez as one of the applicants considered for the post. <u>See</u> Docket No. 43-4 at page 39. The court does not know which is it, and thus, the issue is in dispute due to defendants' own contradicting assertions.

the court finds that the Plaintiff easily meets her burden of establishing a
prima facie case of discrimination.

### b. Actionable Adverse Employment Actions

Given Plaintiff's extensive employment history at Abbott, the court must
now narrow down what adverse employment actions are actionable for purposes
of her claim of discrimination.

In their motion for summary judgment, the defendants assert that "[i]n
this case, plaintiff filed her administrative charge of discrimination before
the ADU and EEOC on October 29, 2013. … As such, any alleged age related
incidents that occurred on or before January 1, 2013 are time barred by the
statutes of limitations." See Docket No. 42 at page 8. The Plaintiff did not
oppose this time frame. From March of 2013 to March of 2014, Gonzalez was
demoted from a Level 17 to a Level 15 position; she was not selected for the
Senior Product Manager (Level 16) position; she was not interviewed or
selected for the Regional Sales Manager (Level 18) position; she received a
negative performance evaluation; and, she was not interviewed or selected for
the Senior District Manager position (Level 16).

During this time, Plaintiff also claims Kim Perez sidelined her from
access to information and presentations necessary to the performance of her
duties. However, according to claimant, these resources were made available
to her younger counterparts. The defendants' discussion of this claim is
reduced to a footnote citing cases from the Sixth Circuit Court of Appeals
holding that her exclusion from a meeting does not constitute an adverse
employment action. See Docket No. 42 at pages 21-22 n. 5. Notwithstanding, in
the context of a retaliation claim, the Supreme Court in Burlington Northern
& Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), took an expansive view
of the type of conduct that qualifies as materially adverse, emphasizing that
the significance of any given act "will often depend upon the particular
circumstances. Context matters." Burlington, 548 U.S. at 69. To that effect,
the Supreme Court stated as follows:

> [a] supervisor's refusal to invite an employee to
> lunch is normally trivial, a nonactionable petty
> slight. But to retaliate by excluding an employee from
> a weekly training lunch **that contributes significantly
> to the employee's professional advancement** might well
> deter a reasonable employee from complaining about
> discrimination. … Hence, a legal standard that speaks
> in general terms rather than specific prohibited acts
> is preferable, for an act that would be immaterial in
> some situations is material in others.

Id. (emphasis ours). Therefore, the relevant question is whether the exclusion materially or significantly disadvantaged the employee. The defendants' argument, thus, holds no water.

Moreover, the court need not travel to other Circuit Courts of Appeals insofar as this court has previously found that an employer's decision to exclude an employee "from important company processes and meetings … would certainly qualify as an adverse employment action." Irizarry-Santiago v. Essilor Indus., 982 F. Supp. 2d 131, 135-36 (D.P.R. 2013) (citing Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir.2002)).

Here, it is uncontested that on October 31, 2013, Gonzalez sent an e-mail to co-defendant Perez complaining that the other employees supervised by Perez, namely, Marisabel Aponte and Glamary Perez, who were both less than forty (40) years old at the time, had received or had access to presentations or information that Perez had not shared with Plaintiff. Gonzalez also stated that this was not the first time that this happened and emphasized the information was relevant to the performance of her duties and the proper implementation of the Company's business strategy. Gonzalez was only able to use said information after one of these co-workers shared it with her. Plaintiff requested from Perez that she grant Plaintiff access to the same so she could have the same opportunities and sources of assistance as her counterparts.

"At this stage, the issue thus becomes whether a reasonable jury could find that the alleged retaliatory actions were material, producing Plaintiff a significant, not trivial, harm." Colon v. Medtronic, Inc., No. 13-1569 GAG, 2015 WL 5089494, at *17 (D.P.R. Aug. 27, 2015). Because the defendants' motion is devoid of any argument to the contrary, the merits of this claim are for the jury to decide.

### c. Purported Legitimate Non-Discriminatory Reasons and Pretext

Having found that the Plaintiff is able to show the elements of a prima facie case of age discrimination, the court must then move on to the next stages of analysis. As the First Circuit set forth in Thermo King and in Autogermana, once the plaintiff establishes a prima facie showing of age-based discrimination, the court proceeds as follows:

> The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for its decisions. If the employer articulates such a reason, the McDonnell Douglas framework - with its presumptions and burdens - is no longer relevant. At this stage, the sole remaining issue is discrimination

CIV. NO. 14-1620(PG)                                                    Page 24

> *vel non*. A plaintiff must be afforded the opportunity
> to prove by a preponderance of the evidence that the
> legitimate reasons offered by the defendant were not
> its    true    reasons,    but    were    a    pretext    for
> discrimination. Ultimately, the plaintiff's burden is
> to prove that age was the but-for cause of the
> employer's adverse action.

Thermo King, 585 F.3d at 447-48 (internal quotation marks and citations
omitted).

        At the third and final step of the McDonnell Douglas framework, the
burden is on plaintiff to show that defendant's asserted reason for its
decisions was a pretext for age discrimination. See Santangelo v. New York
Life Ins. Co., 785 F.3d 65, 70 (1st Cir. 2015). "To meet that burden, '[i]t
is not enough for a plaintiff merely to impugn the veracity of the employer's
justification; he must 'elucidate specific facts which would enable a jury to
find that the reason given is not only a sham, but a sham intended to cover
up the employer's real motive: age discrimination.'" Santangelo, 785 F.3d at
70 (1st Cir. 2015) (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st
Cir.1991)).

        At this stage, "the *McDonnell Douglas* framework falls by the wayside."
Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 140 (1st Cir.2012)
(citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir.1991)). "The
court's focus now turns to 'the ultimate issue,' which is whether — after
assessing all of the evidence on the record in the light most favorable to
[plaintiff] — '[she] has raised a genuine issue of fact as to whether the
termination of [her] employment was motivated by age discrimination.'"
Acevedo-Parrilla, 696 F.3d at 140 (citations omitted). "In order to meet this
burden, '[plaintiff] must offer some *minimally sufficient* evidence, direct or
indirect, both of pretext and of [defendants'] discriminatory animus.'" Id.
(citations omitted).

        "Pretext    can    be    shown    by    such    weaknesses,    implausibilities,
inconsistencies, incoherencies, or contradictions in the employer's proffered
legitimate    reasons    for    its    action    that    a    reasonable    factfinder    could
rationally find them unworthy of credence and hence infer that the employer
did not act for the asserted non-discriminatory reasons." Gomez-Gonzalez v.
Rural Opportunities, Inc., 626 F.3d 654, 662-663 (1st Cir.2010) (citing Morgan
v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997)). In addition, evidence
of    age-related    comments    could    support    an    inference    of    pretext    and
discriminatory    animus,    particularly    if    the    comments    were    made    by    the    key

decisionmaker. <u>See</u> <u>Dominguez-Cruz v. Suttle Caribe, Inc.</u>, 202 F.3d 424, 433 (1st Cir.2000); <u>see also</u> <u>Straughn v. Delta Air Lines, Inc.</u>, 250 F.3d 23, 35-36 (1st Cir.2001) (holding that in combination with other evidence, so-called "stray remarks" may permit a jury in an employment discrimination action reasonably to determine that an employer was motivated by a discriminatory intent).

The court will address in turn the defendants' proffered explanations for having taken the previously listed adverse employment actions against Plaintiff.

The defendants first argue that her claim of demotion is time barred because Gonzalez was notified of said decision at the time of the reorganization on December 22, 2010, well outside the available 300-day term to file an administrative charge before the ADU or the EEOC.[6] According to defendants, since 2010, the Plaintiff was aware that she was to be transferred to another position and was going to be able to temporarily keep her Level 18 compensation and benefits for a maximum of only two (2) years. According to defendants, Plaintiff was informed that her compensation and benefits would be adjusted to the level of the position she was occupying when this two-year period expired if she did not apply and obtain an alternate position. On December 22, 2010, she was additionally notified that she would be transferred to the post of HCP Institutional Marketing Manager, a Level 17 position, effective January 10, 2011. According to the defendants, this notification started the clock for filing an administrative complaint, and thus, the 300-day term had expired by the time she actually did file on October 29, 2013. Alternatively, the defendants claim that her reduction in salary and benefits is only attributable to her inaction because she did not apply to any other positions within Abbott during the two-year term.

The Plaintiff opposed the argument in her response. Gonzalez claims that she understood that, upon the expiration of the two-year term, she would keep her Level 18 salary and benefits since it was her "then current" position when she was informed of the reorganization. Gonzalez also explains that she did

---

[6]"Under the ADEA, a plaintiff must file an employment discrimination complaint with the EEOC within 300 days of the alleged discrimination before bringing suit in federal court." <u>Pérez-Maspons v. Stewart Title Puerto Rico, Inc.</u>, No. CV 14-1636 (GAG), 2016 WL 4940205, at *7 (D.P.R. Sept. 16, 2016) (<u>citing</u> <u>Ramos v. Vizcarrondo</u>, 120 F.Supp.3d 93, 103 (D.P.R.2015) (<u>citing</u> <u>Rivera-Rodriguez v. Frito Lay Snacks Caribbean</u>, 265 F.3d 15, 21 (1st Cir.2001)).

not apply to any other positions during the two-year period because Abbott did not announce and/or publish any positions that were either Level 18, 17 or 16, or within Gonzalez's areas of experience. At any rate, the Plaintiff purports that on March of 2013 Abbott changed the rules of the game transferring her once again, this time to a Level 15 position, which was three levels lower than her original position and two levels lower than the position she was originally transferred to on January of 2011. According to Plaintiff, the term to file an administrative charge began to run upon *this* subsequent notification.

The court agrees in part with Plaintiff. Contrary to what she argues in her motion, it clearly stems from her deposition testimony that she understood that her salary and benefits could be lowered upon the termination of the two-year term if she was occupying a lower level position than the Level 18 she held at the time of the Reorganization. See Docket No. 43-1 at pages 55-56. However, what she was *actually* notified of on December 22, 2010 was that she would occupy a Level 17 position, not a Level 15 position. This change represented an approximate $18,000 difference in her salary. And she first became cognizant of the fact that she would incur an adjustment of an additional two levels on March 19, 2013.

"It is by now well established that, in employment discrimination actions, limitations periods normally start to run when the employer's decision is made and communicated to the affected employee." Morris v. Gov't. Dev. Bank of P.R., 27 F.3d 746, 750 (1st Cir.1994) (citing Del. State. Coll. v. Ricks, 449 U.S. 250, 261 (1980); Muniz-Cabrero v. Ruiz, 23 F.3d 607, 610 (1st Cir.1994) (explaining that, in such situations, the "limitations period … ordinarily starts when the plaintiff knows … of the harm on which the action is based")). "This rule of law is grounded on a solid foundation: when an employee knows that he has been hurt and also knows that his employer has inflicted the injury, it is fair to begin the countdown toward repose." Morris, 27 F.3d at 750. "[C]ontinuity of employment, as it occurred in the instant case, is insufficient to prolong the life of this type of cause of action." Alicea v. Ondeo De Puerto Rico, 389 F. Supp. 2d 269, 275 (D.P.R. 2005)(citations omitted).

It was not until March 19, 2013 that Abbott notified the Plaintiff that she would not be able to keep the Level 17 position she had been occupying at the time the two-year term expired. Accordingly, the court finds that it was

not until said date that the statute of limitations began to run.[7] Her claim of demotion is thus not time-barred. And although the defendants state in their motion for summary judgment that "contrary to what plaintiff alleges she was never demoted," Docket No. 42 at pge 14, an e-mail from a Talent Associate at Abbott dated December 4, 2013 states that Gonzalez suffered a "demotion" in March of 2013. See Docket No. 53-22. No more need be said.

The defendants then argue that they did not select Gonzalez for the Senior Product Manager position because she voluntarily withdrew from the selection process, and not because of her age. In response, the Plaintiff argues that she did not withdraw from the process but only from the procedures of the day, to wit, the presentation before the panel of judges. The next day Gonzalez explained to Mendez via e-mail that she withdrew from the procedures because she felt uncomfortable. Gonzalez also asserted that during the previous three (3) years she had made multiple presentations before Perez and Harris, both of whom were judges of the requested presentation and were aware of her qualifications. Twenty-three (23) minutes after Gonzalez's e-mail, Mendez replied that another candidate had been selected for the position. See Docket No. 43-12 at page 4.

Viewing the evidence in the most favorable light to the Plaintiff, a jury could find that Plaintiff had reason to be uncomfortable. At the time, Plaintiff's attorneys had already sent a letter to Abbott on her behalf; the Plaintiff had filed her administrative claim of discrimination; and, she had complained to Harris of discrimination and retaliation via e-mail. Plaintiff had also complained to Perez via e-mail of being sidelined of important information for the performance of her duties. By then, Gonzalez had also complained to Human Resources in 2011 about what she perceived to be Perez's discriminatory treatment against her. It is important to note that Perez was the Hiring Manager for the Senior Product Manager position, and Harris and Perez were two of the panel member judging the presentations at the final stage of the selection process. In addition, the third panel member, Mendez, admitted that as part of the process of filling the position of Senior Product Manager, she was made aware of Gonzalez's intention to sue Abbott.

The Plaintiff has also submitted sufficient evidence of pretext at this stage. It is a fact that of the three candidates, two were external and

---

[7] The court notes that the two-year term effectively expired on January 11, 2013, at which time the Plaintiff was occupying a Level 17 position. Strictly speaking, if Abbott had stuck by the original agreement, she would have only suffered a 1-level adjustment.

defendants selected Glorimar Molina - a 31-year-old external candidate - for the position of Senior Product Manager. To that effect, Gonzalez argues that defendants went against Company policy of giving preference to internal candidates over external candidates when a position becomes available and an internal Abbott employee is already prepared to occupy a position and meets its requirements. It is an uncontroverted fact that Gonzalez met the minimum requirements for the Senior Product Manager position.

Moreover, the Senior Product Manager position was only posted internally on November 22, 2013. However, this vacancy had already been posted on the professional networking website LinkedIn almost three months prior, on August 28, 2013. That is, the available position was announced internally three months *after* it was posted on the internet and only four days after Gonzalez wrote to Harris inquiring about it and expressing interest in the same. In addition, in an e-mail of November 22nd, 2013, Harris emphasized that it seemed Abbott had a good "*external* candidate slate."

Finally, the Plaintiff asserts a relevant matter that is in dispute: whether or not it was the first time in Plaintiff's years at Abbott that in addition to interviewing candidates, the Company required they make a presentation before a panel of judges. The evidence on record is insufficient for the court to make a definitive finding regarding this important assertion.

"[A] reasonably jury could find these deviations from the Company's policies and practices, or disparate application thereof, as evidence of pretext." Lugo v. Avon Prod., Inc., 777 F. Supp. 2d 275, 291 (D.P.R. 2011), *on reconsideration in part* (May 10, 2011) (citing Kouvchinov v. Parametric Technology Corp., 537 F.3d 62, 68-69 (1st Cir.2008) (stating that pretext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices)). "Evidence establishing a prima facie case, in combination with evidence of pretext, can be sufficient to defeat summary judgment if a rational factfinder could conclude that unlawful age discrimination was the actual, but-for cause of the discrimination." Thermo King, 585 F.3d at 452.

The circumstances surrounding the announcement of the vacancy, management's interest in the external candidates in contravention to policy, and the fact that a significantly younger candidate was selected for the job is enough to raise some eyebrows. In light of our duty to consider the evidence *as a whole* at this stage of the proceedings, as well as our obligation to examine the facts in the light most favorable to Plaintiff, see

<u>Rochester Ford Sales, Inc. v. Ford Motor Co.</u>, 287 F.3d 32, 38 (1st Cir.2002), we hereby hold that sufficient evidence on record exists to permit a factfinder to conclude that the Plaintiff can make out an actionable claim of discrimination regarding the defendants' failure to select her for the Senior Product Manager position.

The same holds true for the Company's refusal to promote Plaintiff for the Regional Sales Manager position and the Senior District Manager position, for which she was not interviewed. With regards to the former, the defendants argue that "she was not considered" for the Regional Sales Manager vacancy of January of 2014 because of the competency issues addressed in her "last three (3) performance appraisals." <u>See</u> Docket No. 42 at pages 4-5. First of all, as pointed out *supra* in footnote 5, whether Gonzalez was considered or not for this position is in dispute because of defendants' own contradicting statements. Second, it is a fact that the prior year, Plaintiff had received an "Achieves Expectations" rating during her 2012 performance appraisal. Third, the Plaintiff has set forth sufficient evidence to create a triable issue of fact regarding her 2013 Midterm Evaluation versus her final 2013 evaluation, in which she received a "PA" rating. According to Plaintiff, she met and at times exceeded the goals set out on her Midterm evaluation, which Perez prepared in September of 2013. But the defendants did not consider her for the Regional Sales Manager position she applied to three months after the Midterm evaluation because of "competency issues." What is more, the same company e-mail of December 4, 2013 that states that she was demoted in March of 2013, sets forth that her 2013 evaluation rating was "achieve." <u>See</u> Docket No. 53-22. As a result, whether the Plaintiff in fact had competency issues that prevented her consideration for the Regional Sales Manager remains to be seen. At any rate, it is uncontested that the Company considered Francisco Vargas, a 41-year-old Category Manager (Level 15), for the position, but was eventually offered to Glamary Perez, a 39-year-old Abbott employee.[8]

The court is at a loss to comprehend how defendants can plausibly argue that no uncertainty surrounds the facts pertaining to this adverse employment decision and that the claim warrants summary dismissal. This despite the

---

[8]It is uncontested that the TMR platform was used to select Glamary Perez for her recruitment as Regional Sales Manager. However, the court notes that defendants' assertions that the TMR program allows for the "automatic" selection of candidates for vacancies (Docket No. 43, SUF #47) does not stem from the record cited. On the contrary, defendants' answer to Plaintiff's interrogatories states that the TMR is the process of identifying and developing individuals with the potential to "**compete**" for a defined leadership role (Docket No. 43-4 at page 36). To compete implies obtaining something **over others**, by definition.

inconsistencies and contradictions on record. Pursuant to the same caselaw cited above, the court finds that Plaintiff has adduced sufficient evidence of pretext to survive summary judgment regarding defendants' refusal to select (or consider) her for the Regional Sales Manager position.

The defendants did not address their failure to consider Plaintiff for the Senior District Manager position she expressed interest about in an e-mail to Harris on March 11, 2014. The court thus deems it waived. See Zannino, 895 F.2d at 17.

Finally, in regards to her 2013 performance appraisal, the defendants argue that all the persons involved in the decision process, namely, Harris, Adames, Laforet and Perez, were close to Plaintiff's age, thereby precluding any inference of age discrimination. See Docket No. 42 at page 16. The court notes that the defendants submitted these individuals' ages at the time the summary judgment was filed and purportedly declined Gonzalez's request for their dates of birth. See Dockets No. 43, 53 at ¶¶ 16, 21. "The court will not do counsel's work," Diaz-Morales v. Rubio-Paredes, 170 F. Supp. 3d 276, 2016 WL 1085226, at *8 (D.P.R. 2016), and calculate their ages at the time of the relevant events herein. Accordingly, the argument is disregarded.

Alternatively, defendants contend that Plaintiff was not the only person to receive a performance rating of "Partially Achieves" since there were other younger counterparts, namely, Francisco Vargas and Dennis Torres, who also received the same rating. See Docket No. 42 at page 16. However, the defendants' argument is unavailing. Despite their alleged performance shortcomings, it is uncontested that Francisco Vargas was considered for the Regional Sales Manager position and Dennis Torres received a promotion from level 14 to 16 on March of 2014 regardless of having received a "PA" rating. Plaintiff, however, was neither considered for promotion or received a raise.

To conclude, the court is mindful that its role is not to "second-guess the business decisions of an employer, nor to impose [its] subjective judgments of which person would best fulfill the responsibilities of a certain job." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir.1990). "Courts may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions." Mesnick, 950 F.2d at 823. Notwithstanding, "courts must be 'particularly cautious' about granting the employer's motion for summary judgment." Soto-Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 25 (1st Cir. 2015) (citing Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir.1998)).

"[W]ith a nod to the premise that determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury," Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996), for the reasons herein stated, the defendants' motion for summary judgment requesting the dismissal of Plaintiff's age discrimination claim is hereby **DENIED.**

### 2. Retaliation

"In addition to prohibiting age discrimination, the ADEA also protects individuals who invoke the statute's protections." Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67, 84 (1st Cir.2005) (citing 29 U.S.C. § 623(d)) ("It shall be unlawful for an employer to discriminate against any of his employees … because such individual … has opposed any practice made unlawful by this section, or … made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."). Where there is no direct evidence of retaliation, the plaintiff may proceed to establish a prima facie case that closely tracks the McDonnell Douglas framework: the plaintiff must show that (1) he/she engaged in ADEA-protected conduct, (2) he/she was thereafter subjected to an adverse employment action, and (3) a causal connection existed between the protected conduct and adverse action. Id.; see also Bennett v. Saint-Gobain Corp., 507 F.3d 23, 32 (1st Cir.2007) (noting that at a bare minimum, this requires an employee to make a "colorable showing of a causal connection" between his protected activity and the adverse employment action).

"Once the plaintiff makes his prima facie showing, the burden shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse employment action." Trainor v. HEI Hosp., LLC, 699 F.3d 19, 26 (1st Cir. 2012) (quotation marks and citations omitted). "If this is accomplished, the ultimate burden falls on the plaintiff to show that the employer's proffered reason is a pretext masking retaliation for the employee's opposition to a practice cast into doubt by the ADEA." Mesnick, 950 F.2d at 827.

Nevertheless, "[t]he McDonnell Douglas framework is not a religious rite; it is 'merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of [retaliation].'" Munoz v. Sociedad Espanola De Auxilio Mutuo y Beneficiencia De Puerto Rico, 671 F.3d 49, 55 (1st Cir. 2012) (citing Furnco Constr. Corp. v. Waters, 438

U.S. 567, 577 (1978)). "Whatever the sources of his proof, a plaintiff, in order to survive judgment as a matter of law, must present evidence from which a reasonable jury could infer that the employer retaliated against him for engaging in ADEA-protected activity." Mesnick, 950 F.2d at 828 (citing Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir.1990); Williams v. Cerberonics, Inc., 871 F.2d 452, 458 (4th Cir.1989)).

"Defendants do not contest that plaintiff engaged in a protected act by filing the complaints and reporting to the SIFC." Docket No. 42 at page 19. Seeing as the Plaintiff lodged several complaints of age discrimination and reported to the SIFC at least twice since 2010, the court cannot ascertain the exact dates of the protected conduct the defendants do not contest.

It sheds some light, though, that the defendants argue that the decision to rate Plaintiff's performance for 2011 as "Partially Achieves" preceded her internal complaint. See id. To that effect, the defendants make reference to one of their proposed facts stating that by October 5, 2011, Perez had already sent Harris her proposed evaluation of Gonzalez's 2011 performance. The court will thus assume at this point that the defendants are referring in their argument to Plaintiff's internal complaint of November 28, 2011, in which she complained about Perez. In her response, however, the Plaintiff contends that she only brings evidence of her 2011's "PA" rating as background evidence because it is time-barred. See Docket No. 55 at page 28 n. 34. The Plaintiff adds that, by omission, the defendants waived the opportunity to seek dismissal for what she claims is an unwarranted "PA" rating for her 2013 performance because they failed to develop any argument in support thereof. The court agrees with the Plaintiff, and thus, the defendants' argument is discarded. See Zannino, 895 F.2d at 17.

Defendants also argue that Plaintiff's transfer after Abbott's reorganization was notified to her on December 22, 2010, and thus, also preceded her internal complaint. However, as previously explained, Abbott informed her that she would suffer an additional two-level demotion and change of position on March 19, 2013, after Plaintiff having engaged in various instances of protected conduct that the defendants do not contest. Therefore, this argument also fails.

Within the ADEA Retaliation section of their motion for summary judgment, the defendants also seek to dismiss Plaintiff's claim that Abbott's letter of April 1, 2013 notifying Plaintiff that she had exhausted her employment reserve period under local law constituted illegal retaliation.

According to the Plaintiff's allegations, the letter threatened her with termination while she was on medical leave under the SIFC, which had ordered rest until July 20, 2013. See Docket No. 1 at ¶¶ 101-106. The defendants argue that the letter bears no temporal proximity to Plaintiff's internal complaint of November 28, 2011 and cite ADEA-related First Circuit cases in support thereof. See Docket No. 42 at page 19. In response, the Plaintiff argues that the letter constitutes illegal retaliation under Puerto Rico Law No. 115. Reporting to the SIFC is not ADEA-protected conduct, meaning it is not an age-based discrimination complaint or charge. Accordingly, the court need not consider this claim under the ADEA framework of analysis.

As to Plaintiff's performance evaluations, the defendants set forth conclusory statements asserting that her performance appraisers all agreed that her rating accurately reflected her performance, and that Plaintiff's past promotions, raises, bonuses, and positive reviews do not negate the sub-par performance reviews she received as Product Manager. See Docket No. 42 at page 20. For the reasons discussed in the previous section, the court finds that issues of relevant facts prevent the entry of summary judgment as to her claim that her "PA" rating of her 2013 performance was unwarranted and retaliatory. As discussed, the Plaintiff created a triable issue of fact regarding the content of her 2013 Midterm Evaluation vis-à-vis her year-end rating. That is, although Gonzalez claims to have met the goals set forth in her 2013 Midterm Evaluation lodged on September of 2013, she received a "PA" rating in her final 2013 evaluation just a few months later after her attorneys had sent a claim letter to Abbott, she had filed a claim of discrimination at the ADU, and she had complained of discrimination and retaliation via e-mail to Harris.[9]

Finally, the defendants contend that she was not selected for the positions she applied to because she either voluntarily withdrew from the selection process, or was ineligible because of her performance issues. See Docket No. 42 at page 21. Plaintiff filed a claim of age discrimination at the

---

[9]Even informal complaints to his employer about age discrimination constitute protected conduct under ADEA. See Soto-Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 31 (1st Cir. 2015) (citing Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 84 (1st Cir.2006) (informal complaint to management may constitute protected conduct); Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir.1998) (assuming that informal complaint to internal personnel department may constitute protected conduct); Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir.1990) (acceptable forms of protected activity under Title VII's analogous clause include not only formal charges of discrimination, but also "informal protests of discriminatory employment practices, including making complaints to management")).

ADU on October 29, 2013 and complained to Harris of discrimination and retaliation on November 18, 2013. Between December of 2013 and March of 2014, she applied and was not selected for the positions of Senior Product Manager, Regional Sales Manager and Senior District Manager. All three were ranked higher than her current Product Manager Level 15 position and were available shortly after she engaged in protected conduct.

"Where the evidence shows only that the decisionmaker knew of the complainant's protected conduct at the time the adverse employment action was taken, causation may be inferred from a very close temporal relationship between the protected activity and the adverse action." Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 72 (1st Cir.2011) (citations omitted). See also Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,' … ."). In addition, the First Circuit Court of Appeals has held that "[t]here are many sources of circumstantial evidence that, theoretically, can demonstrate retaliation in a way sufficient to leap the summary judgment or directed verdict hurdles." Mesnick, 950 F.2d at 828.

> These include, but are not limited to, evidence of differential treatment in the workplace, … , statistical evidence showing disparate treatment, … , temporal proximity of an employee's protected activity to an employer's adverse action, … , and comments by the employer which intimate a retaliatory mindset. Whatever the sources of his proof, a plaintiff, in order to survive judgment as a matter of law, must present evidence from which a reasonable jury could infer that the employer retaliated against him for engaging in ADEA-protected activity.

Id. (internal citations omitted).

Courts confronted by summary judgment motions must focus on "the evidence as a whole." Mesnick, 950 F.2d at 827 (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 458 (4th Cir.1989) (in determining whether it is appropriate to take a retaliation case from the jury, a reviewing court's focus must be on "the evidence as a whole")). "Thus, the critical inquiry becomes whether the aggregate evidence of pretext and retaliatory animus suffices to make out a jury question." Mesnick, 950 F.2d at 827.

As has been previously discussed, the Plaintiff has submitted sufficient evidence of differential treatment, inconsistencies, deviations from Company policy to support a claim of retaliation when considering the record as a

whole. As a result, the defendants motion for summary judgment seeking dismissal of Plaintiff's ADEA claims of retaliation is hereby **DENIED**.

## B. Spoliation

In her opposition, Plaintiff contends that she was denied access to electronic evidence to dispute what she claims was an adverse employment action motivated by age discrimination and retaliation. Plaintiff now claims the defendants spoliated electronic evidence in violation of Federal Rule of Civil Procedure 37(e) causing her prejudice. To wit, Gonzalez argues that Abbott's failure to produce her e-mails from 2013 rendered her unable to dispute her allegedly unwarranted "PA" rating she received in her 2013 performance evaluation. She asks that an inference be drawn that there was evidence in the hands of the defendants that was relevant to anticipated litigation; that it was destroyed or failed to be preserved; and, that said evidence would have been unfavorable to the defendants or detrimental to their defense. See Docket No. 55 at pp. 20-22.

The defendants replied that the only inference that can be drawn is that a litigation hold was put in place on December 2, 2013 and that pursuant to Company policy, any e-mail from before that date was deleted because Plaintiff failed to save her e-mails from 2013. Alternatively, the defendants purport that a spoliation inference is insufficient to defeat summary judgment. See Docket No. 66 at pages 14-15.

"Litigants have the responsibility of ensuring that relevant evidence is protected from loss or destruction." Velez v. Marriott PR Management, Inc., 590 F.Supp.2d 235, 258 (D.P.R.2008)(citing Perez-Velasco v. Suzuki Motor Co. Ltd., 266 F.Supp.2d 266, 268 (D.P.R.2003)).

> [T]his obligation predates the filing of the complaint and arises once litigation is reasonably anticipated … . The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation … . If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of … the possible destruction of the evidence if the party anticipates litigation involving that evidence.

Id. at 258 (citations and quotation marks omitted).

Spoliation "can be defined as the failure to preserve evidence that is relevant to pending or potential litigation. Pursuant to the court's inherent power in managing its own affairs, it may sanction a party for spoliation."

Jimenez-Sanchez v. Caribbean Restaurants, LLC, 483 F.Supp.2d 140, 143 (D.P.R.2007). In fact, "[a] court may impose sanctions, including exclusion of evidence, even '[i]f such evidence is mishandled through carelessness … .'" E.E.O.C. v. Ventura Corp., No. CIV. 11-1700 PG, 2013 WL 550550, at *7 (D.P.R. Feb. 12, 2013) (citing Trull v. Volkswagen of America, Inc., 187 F.3d 88, 95 (1st Cir.1999)). Pursuant to the applicable case law, before an inference of spoliation may be drawn, "the party urging that spoliation has occurred must show that there is evidence that has been spoiled (i.e., destroyed or not preserved)." Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 399 (1st Cir.2012) (citing Tri-County Motors, Inc. v. Am. Suzuki Motor Corp., 494 F.Supp.2d 161, 177 (E.D.N.Y.2007)).

The unsatisfactory evaluation in question took place just a few months after Gonzalez received her Midterm assessment in September of 2013, in which she claims to have met and, at times, exceeded her employer's expectations. The negative evaluation also took place shortly after her administrative charge and internal complaint of discrimination and retaliation.

It is uncontested that Abbott received a letter from Plaintiff's attorneys on October 15, 2013 essentially warning Abbott of potential litigation of age discrimination. Pursuant to applicable law and Company policy, the duty to preserve Gonzalez's e-mails arose on said date. The then existing e-mails from thirty (30) days prior should not have yet been automatically deleted at the time. The court can thus conclude that Abbott was duly placed on notice of potential litigation on October 15, 2013, and not December 2, 2013 as they contend. Abbott should have placed a hold on the deletion of Gonzalez's e-mail account containing messages from September 15, 2013 and thereafter. However, in March of 2014, when Plaintiff requested Yolanda Gonzalez provide her access to her 2013 e-mails, the latter indicated that pursuant to Abbott's e-mail policies, any e-mails for the 2013 year that were not saved by Plaintiff had been automatically deleted, basically shifting the blame onto Plaintiff.

In view of the above, the court finds that Plaintiff has met her burden of establishing that relevant evidence in the hands of Abbott existed and was destroyed after it was on notice that litigation might ensue. As a result, Gonzalez is unfairly disadvantaged. Her inability to have access to this evidence has hindered her ability to question the testimony of her performance appraisers and to establish that the rating she received from them was not the result of poor performance but of discriminatory and/or retaliatory intent.

"A 'spoliation' instruction, allowing an adverse inference, is commonly appropriate in both civil and criminal cases where there is evidence from which a reasonable jury might conclude that evidence favorable to one side was destroyed by the other." <u>United States v. Laurent</u>, 607 F.3d 895, 902 (1st Cir. 2010). In the context of the evidence on record, the court finds that an adverse inference instruction is an appropriate sanction against defendants. <u>See</u> <u>E.E.O.C. v. Ventura Corp.</u>, No. CIV. 11-1700 PG, 2013 WL 550550 (D.P.R. Feb. 12, 2013)(so concluding with respect to e-mail communications pertaining to plaintiff's employment application materials that were directly relevant to proving plaintiff's discrimination claims and disproving the defendant's defenses). As a result, a jury in this case will be instructed to infer that the content of the messages from September 15, 2013 to December 31, 2013 contained in Plaintiff's e-mail account would have been unfavorable to Abbott.

**C. Supplemental State Law Claims**

The remainder of Plaintiff's claims are grounded on Puerto Rico law. The defendants' argument in favor of dismissal of the supplemental claims is grounded on the same reasons developed for their federal counter-parts. Because they failed, Gonzalez's state law claims also remain pending before this court. The defendants' request for their dismissal is hereby **DENIED**.

### IV. CONCLUSION

For the reasons stated above, this court hereby **DENIES** defendants' motion for summary judgment (Docket No. 42) and **GRANTS** the Plaintiff's request for a spoliation sanction.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, October 9, 2016.

S/ JUAN M. PEREZ-GIMENEZ
JUAN M. PEREZ-GIMENEZ
U.S. DISTRICT JUDGE